**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **MAGISTRATE NO. 21-MJ-469 (RMM)** |
| | : | |
| **BRIAN CHRISTOPHER MOCK,** | : | |
| **Defendant.** | : | |

**MOTION FOR EMERGENCY STAY AND**
**FOR REVIEW OF RELEASE ORDER**

The United States of America, by and through its Attorney, the Acting United States Attorney for the District of Columbia, respectfully moves this Court to, first, stay defendant's release pending trial, and second, review the decision by the Magistrate Judge from the District of Minnesota to deny the government's motion for pre-trial detention.

I.    **BACKGROUND**

A.    **Procedural Posture**

On June 11, 2021, defendant Brian Christopher Mock was arrested in his home state of Minnesota on an arrest warrant issued from the United States District Court for the District of Columbia by Magistrate Judge Robin M. Meriweather in connection with a Criminal Complaint charging the defendant with Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), Obstruction of Law Enforcement During Civil Disorder in violation of 18 U.S.C. § 231(a), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority and Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(1) and (a)(2), and Acts of Physical Violence in any of the Capitol Buildings or Grounds in violation of 40 U.S.C. § 5104(e)(2)(F).

1

Following his arrest, the defendant appeared before a U.S. Magistrate Judge in District of Minnesota and the government moved to detain Mock pursuant to 18 U.S.C. § 3142(f)(2)(B), which provides for detention in a case that involves a serious risk that a defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror. After a hearing on June 15, 2021, the Magistrate Judge denied the government's request for detention and ordered the defendant released with certain conditions. Following this ruling, the government orally moved to stay the defendant's release pending an appeal by the government. The Magistrate Judge granted a 24-hour stay of the release order, through June 16, 2021 at 2:00 p.m. Central Time (3:00 p.m. Eastern).

The government appeals that release order here. We also ask this Court to stay the defendant's release pending a hearing on this appeal.  Jurisdiction over this appeal lies in this Court, rather than a court in Minnesota, pursuant to 18 U.S.C. § 3145(a)(1) (if a defendant is released by person other than a judge of the court having original jurisdiction over the offense, an attorney for the Government may file a motion for revocation of the order in the court of original jurisdiction).

**B.** **Statement of Facts**

*i.* *Background on January 6, 2021*

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United

States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which

appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

ii.    *Mock assaults two officers on the Lower West Terrace.*

During their investigation of the attack on the Capitol, FBI employees were reviewing body-worn camera from January 6 when they observed a man, later identified as Mock, assaulting two officers on the Lower West Terrace. Shortly before the assaults, a crowd of violent rioters had assembled near the media tower. Law enforcement officers had formed a line of bike racks to act as a barrier and were fending off repeated attempts by the rioters to pull on the bike racks and assault the officers. The rioters eventually breached the line and swarmed the officers, successfully advancing toward the first landing of the Lower West Terrace and assaulting several officers.

Just before 2:30 p.m., Mock shoved a U.S. Capitol Police Officer (Victim 1) to the ground while another rioter grabbed Victim 1's leg. Mock then appeared to kick Victim 1 as he lay on the ground. Other rioters continued to assault Victim 1. The following screenshots from body-worn camera show Mock in the process of shoving and kicking Victim 1:

4

Shortly after assaulting Victim 1, Mock is on video aggressively shouting at the officers and pointing at them yelling "Get out! Go!" multiple times:



About four minutes after Mock assaulted Victim 1, at 2:34 p.m., the crowd of violent rioters began advancing further on the Lower West Terrace and cornered police officers. Another U.S. Capitol Police Officer, Victim 2, was holding a police shield as protection. Mock shoved Victim 2 to the ground. As Victim 2 was still on the ground, the crowd continued to advance and assault other officers. The following screenshot depicts Mock's assault of Victim 2:



According to Victim 2, his right elbow hit the ground (see above), causing excruciating pain at the time of impact, and bruising later. After shoving Victim 2 to the ground, Mock picked up multiple U.S. Capitol Police riot shields and began to pass them back to the members of the riot crowd:





*iii.      FBI identifies and arrests Mock.*

The FBI posted pictures of Mock, seeking the public's assistance in identifying him. They received several tips identifying Mock by name. Several tipsters explained that they had seen posts on Facebook showing that Mock and his then-girlfriend had traveled to the Capitol together and attended the riots. Many tipsters submitted screen shots of social media posts of Mock and his then-girlfriend at the Capitol, including:





One tipster submitted a video that shows Mock and his companion on or near what appears to be the Lower West Terrace of the Capitol. In the video, Mock says something like "Do you wish to climb the side of this thing?" (referring to the media tower) and "I got maced three times." During another part of the video, where Mock and his companion are both in the frame, the companion states (while smiling) "We just heard Brian made the news" and "I was pulling the gates away after Brian removed them."

The FBI spoke to at least eight people who identified Mock as the person pictured in the photos and videos above, and two of those individuals know Mock very well. One of them stated that Mock "went to DC specifically for this. He is home bragging about beating up cops and destroying property in the capital." Another witness said that Mock bragged that he "beat the sh*t" out of a police officer. That witness showed the FBI a text message conversation with Mock where Mock admitted to his participation in the riots.

The FBI also obtained Mock's Facebook posts through a search warrant. Mock's posts showed that he planned to engage in violent activity at the Capitol:

**Facebook Business Record**     Page 47

**Type**
   Comments
**Summary** Brian Mock commented on a post from January 3. `Be ready for a full blackout. "The Revolution will not be televised."`
**Object Id** S:_I100011664786180:10158984448669798:68

**Time** 2021-01-03 21:52:28 UTC
**Type** Comments
**Summary** Brian Mock commented on a post from January 3. `This was not the war we wanted. We were content to live our lives in peace...but when thrust upon us we will fight with the ferocity and righteousness of a thousand angels that we and our children might live that life of peace and prosperity that we sought out originally. Please call me mad. Make fun of me. I believe it is madness to look around at all that is happening and to sit idly by while our country, our lives, future and the future of our children is ripped out from under us. When the deeds of these days are cast in the history books, what will be your contribution? Will you be like the German citizens who watched Nazis take over their country or those who sat idly by through slavery and Jim Crow?? Will you tweet, post and laugh at the true Patriots? Will, many years from now when your children and grandchildren ask what you did in 2021 to save this country, tell them I sat on my couch in fear, compliant, wearing a mask, watching TV and mocking the Patriots on social media because I was brainwashed by the Left and Mainstream media? When the brave amongst you expose and fight the evil in this world, know that your life, however great it may become is infinitely diminished by your cowardice, apathy and compliance. We aren't mad...we are painfully aware. Fight back, support those who do, get the hell out of the way or prepare to defend yourself. There has been a storm brewing and it will sweep through this country very soon. Sic Semper Tyrranis!`
**Object Id** S: I100011664786180:10158984448669798:67

**Facebook Business Record**     Page 51

**Time**
   2021-01-02 00:17:20 UTC
**Type** Comments
**Summary** Brian Mock commented on a post from January 1. `Well Nancy, that ain't the worst thing that's going to happen to you this week.`
**Object Id** S:_I100011664786180:10158984448669798:34

**Time** 2021-01-08 23:39:48 UTC
**Type** Comments
**Summary** Brian Mock commented on a post from January 8. `I went to the Capitol not knowing what to expect but said goodbye to my 4 children, not sure if I was going to come home. I was at peace with that knowledge. I held my own and then some when I watched Capitol police beating women and old men. When faced with real men, free men, brave men, they fled with fear and tears in their eyes. I supported the blue big

10

The FBI arrested Mock on June 11, 2021. At his home, they found the camouflage hooded sweatshirt, the neck gaiter, and backpack pictured in the screenshots from body-worn camera, and a car-rental receipt showing travel to the District of Columbia. After his arrest, the FBI also interviewed the woman who travelled to the District of Columbia with Mock. She told FBI agents that Mock told her he would "make it bad" for her if she provided any information to the FBI. When Mock saw the publicly-posted FBI photos of him, he told her something to the effect of: "I'm warning you, they're going to be after you too, and if you are the one that tipped them off you're going to go down with me." According to the witness, Mock also told her that she should not tell anyone about the photos, or he would make her life hell. Mock also showed up unannounced at her house more than once and harassed her after their breakup.

### i.    Pretrial services in Minnesota recommends detention.

After Mock made his initial appearance in Minnesota, pretrial services in Minnesota recommended that Mock be detained pending trial, based in part on Mock's criminal history. Mock has a 2010 conviction for second-degree dangerous weapon. That conviction resulted from an incident in which Mock held a gun to three kids' heads and screamed at them. When a woman tried to help the kids and stop Mock, he pushed her and called her a "f****** b****."  When police arrived at Mock's house, he refused to come out and the SWAT team had to be called. Mock also told his wife to tell the police that he was with her the whole night.

### C.    Order for Release

After a detention hearing in the District of Minnesota on June 15, 2021, the Magistrate Judge ordered Mock released on certain conditions. On that same day, the United States orally sought a stay pending this Motion for Review. The Magistrate Judge granted the request and stayed the order for 24-hours, through 2:00 p.m. Central (3:00 p.m. Eastern) on June 16, 2021.

II.   **ARGUMENT**

A.   **This Court has the authority to stay and review the release order.**

Title 18, U.S.C. § 3145(a) states:

> **(a) Review of a release order –** If a person is ordered released by a magistrate, …

> > (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the Magistrate Judge's denial of pre-trial detention. In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not previously raised. In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . .

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196.[1]

---

[1] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

The United States seeks detention pursuant to 18 U.S.C. § 3142(f)(2)(B) because this case involves a serious risk that the defendant will obstruct or attempt to obstruct justice, or will threaten, injure, or intimidate a prospective witness. In this case, the defendant has already attempted to intimidate an eyewitness—threatening his ex-girlfriend that he would "make her life hell" if she gave information to law enforcement. The defendant also has a history of obstruction in that he instructed his then-wife to lie on his behalf in connection with his 2009 arrest. The defendant also engaged in obstructive conduct by virtue of his participation in the riots—he was part of a mob that collectively obstructed the ability of Congress to proceed with the electoral college vote.

**B.     The factors under 18 U.S.C. § 3142(g) weigh in favor of detention.**

In determining whether there are any conditions or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the Court considers the following factors: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and

---

Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3486-3487. (Emphasis added.)

characteristics of the defendant; and (iv) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

### i.     The Nature and Circumstances of the Offense

The defendant's crimes are serious and cannot be viewed in isolation—he was one of thousands of individuals who descended upon the Capitol on January 6 and threatened the democratic process. And he wasn't just a part of the crowd or someone who got caught up in the moment. He was at the front of the crowd that breached police lines on the Lower West Terrace. Once that line was breached, he violently attacked two police officers—shoving both to the ground and kicking one. He didn't stop there. He picked up riot shields and passed them into the crowd of violent rioters.

This Court has outlined specific offense characteristics that serve as guideposts relevant to assessing the comparative culpability of each defendant in relation to the other rioters. *United States v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at \*7 (D.D.C. Feb. 26, 2021). Almost all of the *Chrestman* factors put Mock in a more serious category and demonstrate his dangerousness. First, he has been charged with a felony. Second, he engaged in prior planning before arriving at the Capitol. As his Facebook posts show, Mock came to the District of Columbia with the intention of participating in violence and "disrupting the democratic process." *Id.* at \*8. He posted that he "went to the Capitol not knowing what to expect but said goodbye to my 4 children, not sure if I was going to come home." This statement shows that he intended to engage in violence, potentially deadly violence. Before the riot, he posted "This was not the war we wanted. We were content to live our lives in peace…but when thrust upon us we will fight with the ferocity and righteousness of a thousand angels…Fight back, support those who do, get the hell out of the way or prepare to defend yourself. There has been a storm brewing

14

and it will sweep through this country very soon. Sic Semper Tyrranis!" Mock's goal was to fight in a war, and when given the opportunity, he attacked officers in furtherance of that goal.

Third, Mock encouraged others' misconduct. He collected riot shields that were dropped by the multiple officers who were getting attacked, some of whom Mock himself pushed to the ground. He passed those shields out to others in the violent mob. Mock was also the person who shoved both Victim 1 and Victim 2 to the ground, paving the way for others to assault them while they were down. Fourth, his words and movements demonstrated a dangerous hostility to law enforcement. As this Court has noted, "[g]rave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement…". *Id.* Here, Mock did just that.

The only two *Chrestman* factors in Mock's favor are that there is no evidence he carried or used a dangerous weapon or coordinated with others beyond the two people with whom he went to the Capitol. Otherwise, these factors demonstrate just how much Mock's behavior stands out compared to the other hundreds of defendants charged in the riot. The nature and circumstances of his offenses therefore weigh in favor of detention.

*ii.*    *The Weight of the Evidence Against the Defendant*

The weight of the evidence weighs in favor of detention. He is on body-worn camera violently assaulting two officers, passing back riot shields, and yelling at officers. Some of the clothes he wore in those videos were found at his home. His social media posts confirm he intended to participate in violence and did participate in violence at the Capitol. His ex-girlfriend's social media posts show him at the Capitol. There are at least eight witnesses who recognized Mock in the videos and/or photos. Multiple witnesses say that Mock bragged about beating up officers upon his return home. Taken together, this is very strong evidence of guilt.

15

### iii.     The History and Characteristics of the Defendant

Mock's most serious criminal conviction is the second-degree dangerous weapon conviction from 2010. The circumstances of that offense are disturbing and comport with a pattern of threatening and violent behavior that eventually made its way to the Capitol. Mock held a gun to three kids' heads while aggressively questioning them, believing that one of them started a fire at his house. When a bystander attempted to intervene on behalf of the kids, Mock pushed her and called her a "f****** b****." Mock's history combined with the present offense shows that he is willing to shove just about anybody within the wide range of people who fall between complete strangers and federal law enforcement officers. He is a danger to the community.

Moreover, when Mock returned home from assaulting those children, he told his wife to tell the police he was with her all night. While these events were admittedly over ten years ago, Mock's behavior in the current case follows a similar pattern. In a similar manner, he threatened the woman who went to the Capitol with him to try to stop her from providing information to the FBI. Knowing she was a witness to his criminal acts, he threatened to make things bad for her and make her life hell. That makes three women (the bystander, his ex-wife, and the woman who went to the Capitol with him) that Mock has threatened, injured, or intimidated. The chances are therefore high that he will continue to do so.

Mock also has two convictions for disorderly conduct, both from 2010. He is charged with disorderly conduct on the Capitol Grounds as well—even further establishing a long-held pattern of failing to follow the law. This factor weighs in favor of detention.

### iv.     The Nature and Seriousness of the Danger to any Person or the Community

Mock's actions at the Capitol alone make him a serious risk of danger to the community.

The D.C. Circuit has drawn a distinction between violent and non-violent participants in the Capitol riots, with the former being in a "different category of dangerousness." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir.), judgment entered, 844 F. App'x 373 (D.C. Cir. 2021) (emphasis added). In fact, the court in *Munchel* specifically named those who assaulted police officers as falling into the category of elevated dangerousness. *Id.* Other courts in this district have made the same observation: "Indeed, if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does." *United States v. Fairlamb*, No. 1:21-CR-120-RCL, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021). Mock's release poses both a danger to the community and a danger to the witness he has already threatened. This factor weighs in favor of detention.

III.    **<u>CONCLUSION</u>**

For the reasons explained here, the United States respectfully requests that the Court review the Minnesota Magistrate Judge's decision to release defendant Brian Mock. The United States further requests that the Court stay the release order and schedule a hearing for such review, and order instead that he be held without bond pending trial.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

<u>s/Amanda Jawad</u>
 Amanda Jawad
 Assistant United States Attorney
 District of Columbia Detailee
 N.Y. Bar 5141155
 U.S. Attorney's Office
 211 W. Fort Street
 Detroit, MI 48226
 (313) 226-9116
 amanda.jawad@usdoj.gov

Date: June 16, 2021