UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Magistrate No. 1:21-MJ-469 (RMM) |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S MEMORANDUM IN** |
| | ) | **OPPOSITION TO GOVERNMENT'S** |
| v. | ) | **MOTION FOR EMERGENCY STAY** |
| | ) | **AND FOR REVIEW OF RELEASE** |
| BRIAN CHRISTOPHER MOCK, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.  INTRODUCTION

The Court should deny the government's Motion for Emergency Stay and Review of Detention Order ("Gov't Br.", ECF No. 6).  The government has not met its burden of demonstrating, by clear and convincing evidence, that "no condition or combination of conditions will reasonably assure" the safety of the community.  18 U.S.C. § 3142(e)(1). Thus, the Court should order that defendant Brian Christopher Mock be released, subject to a combination of conditions to ensure he poses no danger to any other person or to the community, including location monitoring, curfew, and a no contact order with any alleged victim or witness.

## II.  BACKGROUND

The following discussion summarizes the procedural history of this matter and the relevant evidence adduced and proffered at a combined preliminary and detention hearing, held on June 15, 2021 before the Honorable Kate M. Menendez, Magistrate Judge for the District of Minnesota.  At the hearing, Federal Bureau of Investigation ("F.B.I.") Special

1

Agent Joshua Stenzel testified, and government's exhibits ("Ex.") A through T (*i.e.*, body worn camera video clips, "screenshot" still photographs, and social media postings) were admitted.  A transcript of that hearing ("Tr.") will be filed contemporaneously with this brief, under seal.  The alleged conduct underlying the charges against Mr. Mock relate to incidents that occurred over a period of approximately four minutes on January 6, 2021, on the lower west terrace outside the United States Capitol building.  (Tr. at 27, 33-34, 36, 50.)

A.    **Mr. Mock's Relevant History and Characteristics**

Now 42 years old, Mr. Mock was born in Leesburg, Virginia, but has lived in Minnesota for the past 21 years and at his current address for the past seven years.  (Bond Report, *United States v. Mock*, Magistrate No. 0:21-mj-00445-HB (D. Minn. June 16, 2021) (ECF No. 1 at 1-2) ("Bond Report").)[1]  Mr. Mock currently lives alone in a home he owns, and he does not own or possess any firearms.  (*Id.* at 2.)  Mr. Mock does not own a passport and has never travelled outside the United States.  (*Ibid.*)

From 2009 through 2021, Mr. Mock worked the same job:  40 hours per week in sales and other roles at a landscaping company located just outside the Twin Cities metro area.  (*Id.* at 3.)  Due to the anticipated negative publicity related to the investigation and filing of the pending charges, Mr. Mock recently lost his job, and records from the Minnesota Secretary of State confirm that he registered his own landscaping business on June 9, 2021,

---

[1]    A copy of the Bond Report will be filed contemporaneously with this brief, under seal.

though he does not yet have a stable income. (*Ibid.*) Mr. Mock has the support of at least one working professional who was a client of Mr. Mock's during his prior employment, but has stated that she would continue to employ him through his new business. (Tr. at 68.) That particular client has stated that she has known Mr. Mock for 12 years and has employed him for both her personal and commercial landscaping needs. (*Id.* at 69.) She described him as a great worker, a person who does good work, and despite being aware of the charges, indicated that she would continue to employ him, as she considers him a friend and remains supportive. (*Ibid.*)

Mr. Mock has four children (ages 19, 12, 10, and 8), all of whom also live in Minnesota. (Bond Report at 2.) Mr. Mock's children primarily reside with their mothers, though Mr. Mock provides both non-court-ordered and court-ordered support to all of them. (*Ibid.*) Mr. Mock's eldest son has stated that he sees his father every other week, and that they text and call continuously and on a daily basis when they are separated. (Tr. at 69.) Mr. Mock's son describes his relationship with his father as strong, and says that Mr. Mock is one of the people he knows best. (*Ibid.*) Mr. Mock's son further states that he is also able to connect with Mr. Mock and to check in with him, and that Mr. Mock will always be there for him if he has a problem, as both an emotional and financial support, including for college. (*Ibid.*)

Prior to his arrest on these charges, Mr. Mock had planned to relocate to Roberts, Wisconsin—a village just over the state border from Minnesota, approximately 40 miles east of Minneapolis—to live with his significant other, with whom he has shared an on-off

relationship for the past 1.5 years.  (Bond Report at 2.)  Mr. Mock's current significant other confirmed the nature and duration of their relationship, stating that Mr. Mock is welcome to stay with her at her residence in Roberts.  (Tr. at 67.)  She owns no weapons, has no criminal history, and remains supportive of Mr. Mock notwithstanding the pending charges. (*Ibid.*)

Between the ages of 18 and 19 (1997-1998), and again more recently in April 2021, Mr. Mock participated in mental health counseling one time per week, though he was not diagnosed with any conditions.  (Bond Report at 4.)  He intends to continue participating in therapy as needed.  (*Ibid.*)  As for substance abuse, aside from alcohol, Mr. Mock has not used any mood-altering substances since 2019 (marijuana); other substance use dates back 33 years to 1998 and earlier, when he was a teenager.  (*Id.* at 4-5.)  His last use of alcohol was in May 2021.  (*Id.* at 4.)

Mr. Mock has three prior criminal convictions; two misdemeanor disorderly conduct offenses, and one felony "Second Degree Assault – Dangerous Weapon" charge.  (*Id.* at 5.) All three convictions arise from a period of seven months between May and December of 2009—12 years ago.  (*Ibid.*)  The Bond Report's description of the conduct underlying the felony conviction is based on incident reports received from the Anoka County Sheriff's Office (*ibid.*), upon which Special Agent Stenzel and the government apparently relied in testifying and characterizing the matter.  (Tr. at 47; *see* Gov't Br., ECF No. 6 at 16.)  Mr. Mock respectfully disagrees with those characterizations as an inaccurate recitation of the true facts of what occurred and what he admitted to after he ultimately peacefully

surrendered and pled guilty in 2010. (Tr. at 63.) Nevertheless, he does acknowledge the validity and seriousness of his prior felony conviction, and notes here that he was placed on seven years of supervised probation, from November of 2010 to January of 2018. (Bond Report at 5.) During that more than seven-year period—and for the three years that followed—Mr. Mock remained completely law-abiding, and was in one hundred percent compliance with all of the terms of his supervision—he did not have a single probation violation. (*Ibid.*; *see also* Tr. at 62.) The December 21, 2017 Anoka County Probation letter requesting his discharge states that he "completed all special conditions of the Court[,]" that a "recent records check indicates no new offenses[,]" and indicates that "he was discharged because of his appropriate and his noteworthy compliance with the terms of his supervised probation." (Tr. at 63.)

As a collateral contact, Mr. Mock's mother confirmed the foregoing information to Pretrial Services, and stated that Mr. Mock "is a hardworking individual who has always ensured to meet his children's needs and that his children need him." (*Ibid.*) Mr. Mock's mother also reported that his family remains supportive of him, despite their awareness of his involvement in this matter. (*Id.* at 2-3.)

## B.    Preceding and Charged Conduct

Prior to January 6, 2021, a social media comment dated January 3, 2021 and attributed to Mr. Mock generally and rhetorically referred to political discontent, but did not

specifically express any intent by Mr. Mock to undertake any specific acts on January 6, 2021.[2]  (Ex. S; *see also* Gov't Br., ECF No. 6 at 10.)

Prior to the charged events, Mr. Mock traveled to Washington, D.C. with his then-girlfriend and another friend.  (Tr. at 27, 37.)  Mr. Mock did not come to the Capitol as part of any coordinated effort with any group, including the Proud Boys or the Oath Keepers.  (Tr. at 37-38.)  Instead, as to the alleged criminal conduct, Mr. Mock "was part of the crowd in general."  (Tr. at 37.)  There is no evidence, including social media postings and the statements of tipsters after the fact, that Mr. Mock had conducted any advanced planning to enter to Capitol building on January 6.  (Tr. at 38.)  Mr. Mock was not wearing any tactical gear[3] and there is no evidence that he had "anything that could be construed as a weapon"—"no gun, no knife, or anything of that nature."  (Tr. at 36-37.)

At some point prior to the charged incident on January 6, Mr. Mock appears to have visited the World War II Monument and to have posed for photographs there.  (Ex. K; Gov't Br., ECF No. 6 at 8.)  At approximately 1:00 p.m., a joint session of Congress convened at

---

[2]     Acknowledging that the Federal Rules of Evidence do not preclude admissibility at a preliminary and detention hearing, Mr. Mock objected to the introduction of Exhibits M, N, R, S, and T—all social media postings—consistent with Federal Rule of Evidence 106 because each of those exhibits contain parts of writings and recorded statements that do not include the remainder that in fairness the Court should consider at the same time.  (Tr. at 8-9.)  The Court overruled that objection, but noted that it would consider the lack of remainder in considering the weight of the exhibits.  (Tr. at 9-10.)

[3]     Although Special Agent Stenzel testified that Mr. Mock was wearing a neck gaiter-style during the charged incident, he also testified that Mr. Mock's face was uncovered at times while he was present at the Capitol, which is part of the reason law enforcement was able to identify him.  (Tr. at 37, 39.)

the Capitol to certify the vote count of the Electoral College of the 2020 election.  (Tr. at 13.)  At approximately 2:00 p.m., a crowd that had previously been in front of the White House traveled to the Capitol area and forced entry into the Capitol grounds, moving past the bike rack barriers, overwhelming the police line and eventually making its way into the Capitol building itself, breaking windows and pushing past Capitol police.  (Tr. at 14.)  At around 2:20 p.m., members of the House and Senate, including Vice President Mike Pence, had to be evacuated.  (Tr. at 15.)

By 2:30 p.m., Capitol police had undertaken some measures to push the crowd outside the Capitol back, including the use of billy clubs, tear gas, and pepper spray.  (Tr. at 27-29.)  At approximately 2:30 p.m., Mr. Mock was at the front of and part of a very large crowd on the lower west terrace, upon which the police had deployed such tactics.  (Tr. at 29, 35.)  The crowd was continuing to push forward, and was inside of a perimeter of bike racks that had been set up on the Capitol grounds.  (Tr. at 36, 50.)  At about 2:30 p.m., Mr. Mock is alleged to have shoved a Capitol police officer to the ground, and to have then kicked the officer.  (Tr. 27, 30.)  The officer's identity is unknown, and it is unknown whether that officer was in the process of pepper spraying Mr. Mock at the time that the alleged kick is believed to have occurred.  (Tr. at 30.)  If Mr. Mock did, in fact, kick the unknown officer, such kick occurred in just one moment, whereas other individuals in the crowd engaged the fallen officer further.  (*Ibid.*)

About 30 seconds after the shove-and-kick incident at about 2:30 p.m., Mr. Mock is depicted on body worn camera video yelling "get out and go" to the officers several times.

(Tr. at 31, 33.)  As he does so, Mr. Mock did not push, kick, or otherwise attack the officers—nor does he encourage others to assault the officers—and instead appears to be telling them to leave the scene, which the officers begin doing as the video ends.  (Tr. at 32-33; *see also* Ex. A.)  It is unknown whether Mr. Mock is telling the officers to leave for their protection, for the protection of the crowd, or for some other purpose.  (Tr. at 32.)

Approximately three minutes and thirty seconds later, at 2:34 p.m., Mr. Mock was still on the lower west terrace outside the Capitol building and very close the site of the first incident when he allegedly shoved another officer down to the ground.  (Tr. at 33-34, 50.)  This second officer was holding a shield and wearing protective clothing.  (Tr. at 18.)  Although the Statement of Facts in support of the Complaint states that the officer experienced "excruciating pain" to his right elbow from impact with the ground where his two protective pads came together (Tr. at 34; *see also* ECF No. 1-1 at 6), that officer did not seek medical treatment, had no long-term effects, and is "fine now."  (Tr. at 34-35.)  Mr. Mock allegedly passed the fallen officer's shield and one other shield back to the crowd behind him.  (Tr. at 18-19, 36.)  There is no evidence that Mr. Mock used the shields to assault any officer or in any other way.  (Tr. at 36.)  Nor is there any evidence that Mr. Mock handed to a specific person in the crowd with any specific purpose in mind; he does not "direct anybody to use it in a particular manner."  (*Ibid.*)

Following the foregoing four-minute period, Mr. Mock did not enter the Capitol building, nor is there any evidence that he destroyed property either on the Capitol grounds or in the Capitol building itself.  (Tr. at 38-39.)

### C.       Post-Incident Conduct

Following the events of January 6, a social media comment from January 8 and attributed to Mr. Mock characterized his conduct as a response to "Capitol police beating women and old men[.]" (Tr. at 46; *see also* Ex. T; Gov't Br., ECF No. 6 at 10.) Although the post apparently portrays Mr. Mock's actions in a heroic light, it is incomplete and leaves off mid-sentence in an apparent expression of support for police in general. (Ex. T; Gov't Br., ECF No. 6 at 10.) One of Mr. Mock's companions, his then-girlfriend, similarly described the incident, stating in a January 6 / 4:23 p.m. social media post in which Mr. Mock was apparently "tagged" that they were "[t]eargassed 6 times, pepper sprayed, and mustard gassed at the end[,]" "[b]ut we stayed true to being Patriots, marched to the Capit[o]l and stormed the Frontline… no regrets… ashamed of the blue that harmed everyone there to stand for the cause.[]" (Ex. L; *see also* Gov't Br., ECF No. 6 at 9.)

The F.B.I. identified Mr. Mock through tips solicited via social media postings. (Tr. at 20-24.) Although Special Agent Stenzel testified that tipsters indicated that Mr. Mock "had radical views" and "had bragged about beating the shit out of police officers" and "destroying property at the Capitol" (Tr. at 22-23), there is no evidence that—other than shove-and-kick events alleged between 2:30 p.m. and 2:34 p.m. on January 6—that Mr. Mock assaulted any police officers or destroyed any property. (Tr. at 45-46.) Nor is there any evidence of such statements by Mr. Mock on social media. Nor is the any evidence Mr. Mock ever attended any other rallies or protests of national security concern. (Tr. at 45.) Nor is

there any evidence that, following the events of January 6, Mr. Mock was part of any violent movement to overthrow the government.  (*Ibid.*)

Given the government's investigative efforts, there is little dispute that Mr. Mock was aware that charges were imminent, long before they were actually filed.  (Tr. at 43.) Nevertheless, Mr. Mock made no attempt to flee Minnesota.  (Tr. at 43-44.)  Prior to his arrest in this case, Mr. Mock contacted the Federal Defender's Office for the District of Minnesota, seeking legal representation to make some arrangement to face these charges. (Tr. at 66-67.)  But the Complaint was not filed and the Arrest Warrant was not issued until June 10, 2021.  (Tr. at 43; ECF Nos. 1, 5.)  He had no opportunity to appear by Summons. (Tr. at 43.)  On June 11, 2021, Mr. Mock was arrested peacefully at his home in Minneapolis. (Tr. at 44; ECF No. 5.)  A search warrant was executed on his residence, and no guns, dangerous weapons, or contraband of any kind was located.  (*Ibid.*)  He made no attempt to flee, and he made no violent statements or threats to police when he was arrested.  (Tr. at 44-45.)

Special Agent Stenzel testified that, after Mr. Mock was arrested, F.B.I. agents conducted a telephonic interviewed with the woman Mr. Mock was with on January 6 at the Capitol, *i.e.*, his ex-girlfriend.  (Tr. at 22. 24.)  Despite the fact that the woman's own social media postings indicated that she herself had bragged on social media about her own part in the events of January 6 involving Mr. Mock (Ex. L; *see also* Gov't Br., ECF No. 6 at 9), Special Agent Stenzel testified that the woman stated that it was Mr. Mock who "had been bragging about beating up cops and destroying property at the Capitol and . . . mentioned

being up close to the building and . . . ripping away barriers and removing blockages for the crowd to proceed." (Tr. at 23.)

Special Agent Stenzel further testified that the woman also said "Mr. Mock advised her that he would make it bad for her if she provided any information to the F.B.I.[,]" and that

> Mr. Mock had shown up unannounced to her home, had seen public photos the FBI had posted of him and warned her that we were going to be coming after her as well, and that if she had tipped [the F.B.I.] off, he had threatened to essentially bring her down with him. Mr. Mock also told her not to call anyone about photographs and not tell anyone or he would make her life hell. He further advised that she needed to be on the honor system and not talk to the FBI.

(Tr. at 23-24.) In its brief, however, the government characterizes the foregoing interview slightly differently; rather than stating that Mr. Mock had shown up unannounced at the woman's home to dissuade her from speaking with the F.B.I., the government asserts that the woman reported that Mr. Mock "showed up unannounced at her house more than once and harassed her after their breakup." (Gov't Br., ECF No. 6 at 11.)

Although the F.B.I. interview with the woman indicated that Mr. Mock said he could make things difficult for the woman and that he would tell on her, there was no evidence or suggestion that there was a threat of physical violence—"nothing of a physically threatening nature, nothing specific," and no mention of weapons or harm. (Tr. at 52.) It is unclear when the alleged statements by Mr. Mock to the woman are believed to have taken place. (Tr. at 61-62.) The woman did not seek any order for protection (*i.e.*, protective order) after

her purported conversation with Mr. Mock, and the F.B.I. made no effort to assist the woman to obtain such an order after its interview with her.  (Tr. at 42-43, 52.)

### D.   Procedural History

As indicated above, Mr. Mock was arrested on June 11, 2021 in Minnesota, and a preliminary and detention hearing was held on June 15, 2021 before a magistrate judge in the District of Minnesota.  (Tr. at 1, 43.)  The Complaint in this case charges Mr. Mock with:

- Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1);

- Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(1), (2);

- Obstruction of Law Enforcement During Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); and

- Acts of Physical Violence in any of the Capitol Buildings or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F)

At the June 15 hearing, the magistrate judge found probable cause but denied the government's motion for detention pending trial, finding that there are conditions that can be crafted that protect the community, protect witnesses, and ensure that Mr. Mock will appear for future court appearances.  (Tr. at 56, 72; *see also United States v. Mock*, Magistrate No. 0:21-mj-00445-HB (D. Minn. June 16, 2021) (ECF Nos. 5, 8-9).)  At the government's request, the magistrate judge simultaneously stayed its release order (*id.* at ECF No. 10), and the government filed the instant motion on June 16, 2021 (Gov't Br., ECF No. 6.)  This Court granted the government's motion for emergency stay on June 16, 2021 (ECF No. 8),

and set a briefing schedule on June 17, 2021, with a hearing on the matter noticed for June 22, 2021.

## III.   LEGAL STANDARD

This Court reviews a magistrate judge's release order *de novo*. *See United States v. Owens*, No. 21-CR-286 (BAH), 2021 WL 2188144, at *5 (D.D.C. May 28, 2021) (citing *United States v. Chrestman*, Case No. 21-mj-218 (ZMF), 2021 U.S. Dist. LEXIS 36117 at *14–18, *14 n.5, 2021 WL 765662 (D.D.C. Feb. 26, 2021) (collecting cases and detailing analysis)).

The Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, provides that a judicial officer "shall order" the "pretrial release of" a defendant, 18 U.S.C. § 3142(b), (c), unless, after a detention hearing, and upon consideration of "the available information concerning" enumerated factors, *id.* § 3142(g), "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," in which case the judicial officer "shall" order pretrial detention, *id.* § 3142(e)(1).   In other words, the relevant inquiry is whether a defendant is a flight risk or a danger to the community. *See Owens*, 2021 WL 2188144, at *5 (quoting *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019)).

The Court must account for the following four factors:

(1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence";

(2) "the weight of the evidence against the person";

(3) "the history and characteristics of the person, including . . . the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearances at court proceedings"; and

(4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).

Detention must "be supported by 'clear and convincing evidence' when the justification is the safety of the community." *United States v. Munchel*, 991 F.3d 1273, 1279–80 (D.C. Cir. 2021); *see also United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). For pretrial detention based on dangerousness, the government must thus "prove[ ] by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community. . . ." *Munchel*, 991 F.3d at 1280 (emphasis in original; quotation omitted); *see also id. at* 1283 ("Therefore, to order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community."). Such "threat must also be considered in context," and "depends on the nature of the threat identified and the resources and capabilities of the defendant." *Id.*

Given the specific guidance of *Munchel*, a defendant merely posing a danger to others and the community on January 6, 2021 is insufficient to "warrant this exceptional treatment" of pretrial detention. *Id.* at 1285. Rather, dangerousness must be predicated on a finding that a defendant "in fact pose[s] a threat of committing violence in the future." *Id.* at 1284.

## IV.   DISCUSSION

The government contends that Mr. Mock should be detained because Mr. Mock "has already attempted to intimidate an eyewitness" (*i.e.*, his ex-girlfriend); because he has "a history of obstruction" related to comments he allegedly made to his ex-wife in relation to his 2009 felony arrest; and because he "engaged in obstructive conduct by virtue of his participation in the riots[.]"  (Gov't Br., ECF No. 6 at 13.)  The Court should find that the government has not met its burden of demonstrating, by clear and convincing evidence, that "no combination of conditions will reasonably assure" the safety of the community, 18 U.S.C. § 3142(e)(1), and should therefore order that Mr. Mock be released, subject to a combination of conditions to ensure he poses no danger to any other person or to the community.  Each of the relevant statutory factors is discussed below.

### A.   The Nature and Circumstances of the Offense

In *Chrestman*, *supra*, this Court has adopted six factors to assist in evaluating "the nature and circumstances of the offense charged, including whether the offense is a crime of violence" per 18 U.S.C. § 3142(g)(1), to wit, whether a defendant:

(1) "has been charged with felony or misdemeanor offenses;"

(2) "engaged in prior planning before arriving at the Capitol;"

(3) carried or used a dangerous weapon during the riot;

(4) "coordinat[ed] with other participants before, during, or after the riot;"

(5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct;" or

(6) expressed "words" and made "movements during the riot" that included "breach[ing] the interior of the Capitol building," "injur[ing], attempt[ing] to injure, or threaten[ing] to injury others, or ... damag[ing] or attempting to damage federal property," "actively threaten[ing] or confront[ing] federal officials or law enforcement" or "otherwise promot[ing] or celebrat[ing] efforts to disrupt the certification of the electoral vote count."

2021 U.S. Dist. LEXIS 36117 at *20–24, 2021 WL 765662.

Mr. Mock is charged with two felony and two misdemeanor offenses.[4]  The most severe of the crimes alleged, 18 U.S.C. § 111(a)(1), carries a potential punishment of up to eight years in prison.  Unlike in *Owens, supra*, there is no weapons enhancement applicable to this case.  Mr. Mock does not appear to be a member of any organized group that planned for a riot and attack on the Capitol on January 6, 2021.  The extent of Mr. Mock's coordination with other participants, either before or after January 6, is limited to his travel his ex-girlfriend and his friend to Washington, D.C., and then accompanying his ex-girlfriend during the events leading up to and during the 2:30 p.m. to 2:34 p.m. alleged conduct on the lower west terrace outside the Capitol building.  His one prior social media post from January 3, 2021 indicates no specific plan and can be fairly characterized as largely symbolic speech and common contemporary political rhetoric.  He made no specific threats of violence in person or on social media before, during or after the events of January 6 at the Capitol.  Mr. Mock also does not appear to have come to the Capitol prepared for conflict;

---

[4]     Based on the evidence adduced at the January 15, 2021 hearing, the factual predicates necessary to characterize the charges under 18 U.S.C. § 1752(a)(1) and (2) as a felony appear absent.

he wore no body armor or tactical gear, and he brought no dangerous weapon for offensive or defensive uses, such as a taser, firearm, baton, axe or chemical spray.

Mr. Mock does not minimize the seriousness of the charges against him.  However, notwithstanding his alleged conduct, Mr. Mock's alleged behavior is mitigated by other considerations, including the lack of record evidence that he engaged in any preparation, premeditation or coordination for the events of January 6 or for violence targeted to harm, disable or disarm police officers that day.  Mr. Mock therefore respectfully requests that, should the Court find the first factor weighs in favor of detention, it find that it only modestly does so.

**B.      The Weight of the Evidence Against Mr. Mock**

Mr. Mock will submit to the Court's determination of whether the weight of the evidence—including the body camera video, still pictures, alleged statements by tipsters, and social media postings—is strong.  Assuming *arguendo* that the Court will so find, Mr. Mock asks the Court to consider the fact that his alleged conduct appears to have caused little to no physical harm to the officers involved.  There is no evidence that any officer was suffered any sort of lasting harm as a result of Mr. Mock's alleged behavior.  Instead, Special Agent Stenzel specifically testified that the officer involved in the 2:34 p.m. incident is "fine now" and needed no medical treatment.

Thus, while the Court may find that this second factor favors detention given the assault allegations, Mr. Mock asks the Court to consider the foregoing as well.

### C.     The History and Characteristics of Mr. Mock

The third factor regarding Mr. Mock's history and characteristics favors release. Mr. Mock is 42 years old.  His substance abuse and mental health history are minimal and manageable.  As noted by the Minnesota magistrate judge, Mr. Mock has extremely strong ties to Minnesota and Wisconsin (Tr. at 79), where he has lived 21 years and has raised his family.  As both Mr. Mock's mother and 19-year-old son stated, he has a very strong and pro-social relationship with his children.  And as his current girlfriend and one of his long-time landscaping clients have indicated, Mr. Mock has their support, in addition to that of his family.  Mr. Mock has worked continuously for the past 12 years for a landscaping business, and has sought to start his own business after losing his job in relation to the investigation of these charges.

Apart from one prior felony and two misdemeanor convictions dating back to 2009, Mr. Mock has no other criminal history.  Mr. Mock does not minimize the seriousness of his prior felony conviction.  However, the Minnesota magistrate judge who ordered Mr. Mock's release addressed that issue squarely:

> I want to start by addressing Mr. Mock's prior criminal history, which is circumscribed and quite dated, but very serious and disconcerting.  I don't want anything that I say to be read as a suggestion that it wasn't serious conduct, that it wasn't violent and grave.

> At the same time I observe that he was placed on seven years of probation, which is a very long time to be supervised, and there is no allegation that he did anything to violate such a lengthy period of supervision. If anything, that supports the inference that when placed on conditions of probation and reporting to a court, he can and will comply with those court orders.

. . . .

. . . . I do not give much weight to the fact that in 2009 Mr. Mock told his wife to say he had been here all night. We so often see conduct in the immediate course of an offense to try to avoid detection. In fact, even the sentencing guidelines draw a line between conduct like that and conduct that is after an investigation is underway truly obstructive.

(Tr. at 72-74.)

Mr. Mock respectfully submits to the Court that the foregoing reasoning aptly addresses any concerns raised by the government as to his history and characteristics. Mr. Mock therefore asks the Court to find that this factor favors his release.

### D.   The Nature and Seriousness of the Danger Posed by Mr. Mock's Release

Mr. Mock requests that the Court find that the nature and seriousness of the danger to the community posed by his release favors pretrial release here, subject to the combination of conditions ordered by the Minnesota magistrate judge.   (*See United States v. Mock*, Magistrate No. 0:21-mj-00445-HB (D. Minn. June 16, 2021) (ECF No. 8).)

The Court must find, by clear and convincing evidence, that Mr. Mock "presents an identified and articulable threat to an individual or the community," *Munchel*, 991 F.3d at 1282 (quotation omitted), which threat must be "considered in context" regarding "the nature of the threat identified and the resources and capabilities of the defendant," *id.* at 1283.   Merely showing the danger a person posed to others or the community, or even our democratic institutions, on January 6 is not enough to justify pretrial detention but, now

19

that "the specific circumstances of January 6 have passed," *id.* at 1284, the task is to determine whether the defendant "pose[s] a threat of committing violence in the future," *id.*

Here, the Court should find that the government has not shown by clear and convincing evidence that Mr. Mock poses an ongoing danger to the community outside of the context of January 6, 2021 events at the Capitol. Apart from the 2009 felony offense addressed above, Mr. Mock has no history of violence before January 6. After successfully completing seven years of probation for the 2009 offense without a single violation, Mr. Mock remained completely law-abiding for an additional three years until he was caught up in the events of January 6. Nothing in the record suggests that he specifically planned for his actions, and despite the favorable January 8 social media characterization attributed to him, Special Agent Stenzel could point to no evidence at the January 15 hearing that indicated any further commitment to engaging in the behavior exhibited at the Capitol that concerned the D.C. Circuit in *Munchel*. 991 F.3d at 1284. As this Court stated in *Owens*, "*Munchel* sets a high threshold for the requisite finding of future dangerousness for defendants charged for offense conduct arising out of the January 6 events at the Capitol." 2021 WL 2188144, at *10.

Indeed, despite the assault allegations against Mr. Mock and *Munchel*'s indication that such conduct places individuals "in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way," 991 F.3d at 1284, this Court retains a "grave constitutional obligation to ensure that the facts and circumstances of each case warrant" the "exceptional treatment" of detention. *Id.* at 1285.

In other words, the Court must "'probe the precise nature of defendant's actions—including the type of any force employed—when assessing' a defendant's dangerousness under the § 3142(g) factors." *Owens*, 2021 WL 2188144, at *11 (quoting *United States v. Padilla*, Crim. No. 21-214 (JDB), 2021 U.S. Dist. LEXIS 84859, 2021 WL 1751054 (D.D.C. May 4, 2021)).

Here, there is no evidence that Mr. Mock cheered on violence, nor is there evidence that he ever attempted to enter the Capitol building by force.  Moreover, although the allegations here concern two shoves and a kick on two officers over the course of four minutes on January 6, Mr. Mock did so with apparent planning, coordination, or dangerous weapons, and in the midst of a pressing crowd.  Thus, "the presence of the group was critical" to Mr. Mock's ability to assault a police officer, *Munchel*, 991 F.3d at 1284, and outside those "specific circumstances that made it possible on January 6," *id.*, for defendant to engage in such an assault, the likelihood of future violence to the community or to other law enforcement officers, appears small, particularly given his exemplary performance under previous court supervision over a very long period of time, as well as the release conditions now available to this Court.

This assessment of Mr. Mock's dangerousness is consistent with the government's own determinations in analogous cases, where defendants were charged with even more egregious offense conduct violative of 18 U.S.C. § 111(b) for physically assaulting police officers with a taser, lacrosse stick and fists, respectively, but were released pretrial without government opposition.  *See, e.g., United States v. Gossjankowski*, 21-cr-123-PLF; *United States v. Blair*, 21-cr-186-CRC; *United States v. Leffingwell*, 21-cr-005-ABJ.  Like Mr. Mock, none of

those three defendants were part of any organized gang, nor had they engaged in any prior planning or coordination with others for their participation on January 6. Their lack of discernible criminal or violent history may be a distinguishing factor, but again, the Court should nevertheless consider Mr. Mock's spotless probationary record following the 2009 offense. As in *Owens*, the evidence presented here alleges that Mr. Mock shoved-and-kicked two law enforcement officers in the midst of a large crowd, and the Court should likewise find that "[t]his falls short of demonstrating that defendant poses the kind of dangerousness requiring pretrial detention since the risk he poses to the safety of the community and others may be cabined by tailored release conditions." 2021 WL 2188144 at *12.

As to the allegations that Mr. Mock attempted dissuade his ex-girlfriend from speaking to the F.B.I., Mr. Mock again asks the Court to consider the reasoning of the Minnesota magistrate judge who ordered Mr. Mock's release:

> . . . [T]he conduct alleged with respect to the witness here gives me pause. It is disconcerting that Mr. Mock communicated with a witness and attempted to prevent her from cooperating with the government by pointing out that he would bring her down with him. Unlike the government, who suggests that "bring you down with me" could mean something violent, I think it's pretty clear what it means is if you talk about me, I'll talk about you and we'll both end up in trouble together. That's obstructive, but not violent.

> "Make your life hell" is even more concerning, but I think it's pretty clear that he didn't act on any of those communications, that the witness didn't describe any threats of physical violence, even suggestions of physical violence, and the witness didn't get an order for [protection] or express to law enforcement that this had been ongoing behavior or that Mr. Mock had been driving by her home or posting threats on Facebook or any of the things that would take it into a more aggravating nature. So I do find that that communication, while very concerning, can be addressed with the application of conditions . . . .

22

(Tr. at 74-75.)  Given the location monitoring, curfew, and no contact conditions ordered by the Minnesota magistrate judge, in conjunction with Mr. Mock's demonstrated ability to strictly comply with all Court orders—to "complete[] all special conditions of the Court," as the Anoka County Probation Office put it in recommending Mr. Mock's discharge after seven years of supervised probation (Tr. at 63.)—the Court should find that this last factor weighs against pretrial detention.

* * *

After considering all of the § 3142(g) factors, in addition to the specific guidance of *Munchel*, Mr. Mock asks the Court to find that, although his alleged pushing and kicking conduct between 2:30 p.m. and 2:34 p.m. on January 6 may have been dangerous then, the future risk he poses to the safety of others and the community can be contained with stringent conditions of release.

## V.     CONCLUSION

For the foregoing reasons, Mr. Mock respectfully requests that the Court find that the government has failed to meet its burden of establishing, by clear and convincing evidence, that no condition or combination of conditions will reasonably ensure the safety of any other person or the community were defendant released pending trial.  18 U.S.C. § 3142(e)(1).  Accordingly, Mr. Mock humbly prays that the Court deny the government's Motion for Emergency Stay and Review of Detention Order.  Mr. Mock greatly appreciates the Court's time and attention to his case.

DATED:  June 17, 2021                              Respectfully submitted,

*s/Keala C. Ede*

_____

KEALA C. EDE
Minnesota Attorney ID No. 387316
Attorney for Defendant
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415